UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DANIEL MINTZ, ANDREA WINTER,
JAMES BIANCOLO AND SANDRA BIANCOLO,
ANN PHILLIPS, STEVEN BAUM,
CAROL WINSTON, VERNON KOHLENBERGER
AND DONNA KOHLENBERGER,
LAWRENCE WOLFE AND PAMELA WOLFE,
CRAIG PEHLERT AND MELISSA PEHLERT
AND ROBERT HACKMANN AND
JANE HACKMANN,

    Plaintiffs

v.

Civil Action No.
04-10809-MAP

THE ROMAN CATHOLIC BISHOP OF
SPRINGFIELD, THOMAS L. DUPRE, BISHOP;
ARLENE D. SCHIFF, CLIFFORD SNYDER,
HAROLD BROWN, JEDD HALL AND
NED DOUGLAS AND EDWIN MAY,

    Defendants

**MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFFS' CROSS MOTION FOR SUMMARY JUDGMENT**

1

# TABLE OF CONTENTS

I. STATEMENT OF FACTS ............................................................................................ 3

II. ARGUMENT: PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT SHOULD BE GRANTED UNDER COUNTS I, II, IV, V AND VI OF THE COMPLAINT ............................................................................................................ 7

    1. RLUIPA is not intended to apply to the present case ........................................ 8

    2. Plaintiffs cannot establish that complying with §9.18 presents a substantial burden under RLUIPA ........................................ 9

    3. Section 9.18 is not discriminatory ........................................ 15

    4. Section 9.18 furthers a compelling governmental interest and is the least restrictive means of furthering that interest ........................................ 19

    5. If §9.18 is unenforceable under RLUIPA, the permit should be remanded to the ZBA to determine the appropriate extent to which the Bylaws should apply to religious uses ........................................ 21

    6. RLUIPA Does Not Preempt The Application Of The Dover Amendment ........................................ 23

    7. The Constitutional Status of RLUIPA is uncertain and does not provide a basis for Summary Judgment ........................................ 25

    8. The Amended Bylaw has no affect on the present action ........................................ 27

I. **STATEMENT OF FACTS**

The plaintiffs in this action are a group of homeowners who either directly abut the church and rectory known as St. Ann's Parish or reside on St. Ann's Avenue in the Town of Lenox. St. Ann's Avenue is not an avenue in any sense but rather is a narrow lane, without sidewalks, which dead ends approximately two blocks east of the Church Buildings. The street is from 18-21 feet, just barely allowing two cars to pass (Complaint Exh. C). The neighborhood is dense but quiet, consisting of late 19th to early 20th century single family, two-story homes, many of which have less than 1900 square feet of living area (Exh. A, pages 1-7).

All of the vehicular and most pedestrian access to and egress from the church buildings is via St. Ann's Avenue. At the beginning and end of church services and functions, the street is blocked with cars and pedestrians as parishioners arrive and leave (Exh. B, par. 6). During church functions, even for small events or meetings, parishioners regularly park on the street in violation of posted no parking areas (Exh. B, par. 5). Since there are no sidewalks or designated crossings, St. Ann's Avenue is used as a walkway, with small children and the elderly regularly blocking traffic. This existing safety hazard is compounded by the fact that Lenox police do not enforce any of the parking regulations during church functions (Exh. B, par. 7-8).

St. Ann's proposes to build a single story 3,500 square foot "parish center" (the "Hall) on this quiet street which is already overburdened during existing church functions. The plan provides for the inclusion of a social hall, a public kitchen, office space and handicap-accessible bathrooms (Complaint, Exh. C). The Hall will be behind the existing church structure, away from Main Street and closer to the homes on St. Ann's. It will create additional noise, pedestrian traffic and congestion. The safety of both residents and those attending church functions will be impaired due to the narrow street, lack of sidewalks and lack of adequate off-street parking.

It is interesting – if not ironic – to note the special treatment received by St. Ann's as it contended that the Bylaws discriminated against it. Despite the tremendous impact the Hall will have on a residential neighborhood, St. Ann's chose to pursue a strategy of circumventing the local review process – a process which could have mitigated the impact on the neighbors while still allowing for the construction of the Hall. Representatives of St. Ann's responsible for planning the Hall never held a meeting to inform neighbors of St. Ann's plans. No hearings were held before the Historic District Commission, the Planning Board or the Zoning Board of Appeals.

Instead, on November 26, 2003, a Building Permit was issued by Mr. Edwin May, Assistant Building Inspector for the Town of Lenox. Plaintiffs were not formally advised of the issuance of the permit.[1]

On December 18, 2003, Plaintiffs filed an appeal pursuant to Section 11.2.1 of the Zoning Bylaw of the Town of Lenox (the "Bylaws") with the Lenox Zoning Board of Appeals (the "ZBA"), requesting that the ZBA revoke the building permit. The notice of appeal stated that the issuance of the permit was in violation of Sections 1.1, 4.7, 5, 6, 8.4, 9.18 and 10 of the Bylaws. (Complaint Exh. G).

On January 21, 2004, the ZBA held an initial hearing to determine whether the building permit should be revoked. In addition to comments by St. Ann's officials and parishioners, presentations were made by Philip Heller, Esq. who previously submitted a <u>Memorandum in Support of Application for Building Permit for St. Ann Church</u> (Complaint, Exh. D) on October

---

[1] Had the plaintiffs not been diligent in regularly checking town records to see if a permit had been issued, it is possible that plaintiffs' time to appeal the issuance of the permit would have lapsed. It is also possible that the first notice the abutters and residents would have received of the Hall would have been heavy construction equipment. It is doubtful that RLUIPA was intended to work this way.

7, 2003 as part of the permit application. A presentation was also made by Donald R. Dubendorf, Esq. who, acting as Special Town Counsel, submitted an opinion letter, dated November 20, 2003 (Complaint, Exh. E) to the Assistant Building Inspector.

The central issue addressed by Special Town Counsel was whether the Religious Land Use and Institutionalized Persons Act of 2000, 42 USC 2000cc et. seq. ("RLUIPA") a new and relatively untested federal law, pre-empts the application of Section 9.18 of the Bylaws, which is the section which sets forth certain specific land use requirements for religious and educational uses. Special Town Counsel concluded that RLUIPA pre-empted Section $9.18^2$ (Complaint, Exh. E). At the January 21, 2004 hearing, Mr. May, the Assistant Building Inspector, stated that he granted the building permit "based on the fact that town counsel, Don Dubendorf, told him that that was the appropriate thing to do" (Exh. D at 6-7). At the hearing, plaintiff's counsel submitted a letter clarifying that the purpose of the hearing was solely to determine if the permit had been issued in error and whether St. Ann's should be required to apply for a variance, a special permit or exempt use status before the ZBA (Complaint, Exh. H). Subsequent hearings were held before the ZBA on February 12, 2004 and February 26, 2004. Since the issue before the ZBA was whether or not it was appropriate to grant a permit of such impact without a hearing, the Plaintiffs' presentation offered evidence as to the grounds for a new hearing, and did not offer substantial evidence as to the serious detrimental impact the Hall would have on the neighborhood.[3]

---

[2] St. Ann's counsel provided Town counsel with a memorandum of law supporting St. Ann's claim that RLUIPA required a building permit to be issued. Plaintiffs were not notified that a memorandum had been submitted with the building permit and did not have an opportunity to respond.

[3] Had St. Ann's permit application been reviewed before the ZBA, four of five votes were required for a permit to be issued. By requiring the Plaintiffs to appeal the permit, the burden shifted to Plaintiffs to obtain four of five votes to have the permit revoked.

At the final February 26, 2004, hearing, counsel for the Diocese presented a revised plan for the Hall (Exh. E). Under the revised plan a covered walkway which connected the church to the Hall was removed. Under the new plan the Hall was twenty-eight feet away from the church at its closest point. On February 26, 2004, after the close of the public hearing, the ZBA, in the decision phase, rejected the Assistant Building Inspector's determination that additional parking would not be required as long as the buildings were not used at the same time. The ZBA voted 5-0 to uphold the Assistant Building Inspector's grant of the permit and required that St. Ann's provide fifty additional spaces. The Abutters were not given any opportunity to comment as to the location, design or adequacy of the proposed parking (Exh. F).


## II. ARGUMENT: PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT SHOULD BE GRANTED UNDER COUNTS I, II, IV, V AND VI OF THE COMPLAINT

Each count of the Complaint essentially arises out of the misapplication of RLUIPA[4]. Special Town Counsel erroneously concluded that §9.18 "burdened" St. Ann's and could not be applied. Town counsel then "explained" to the building inspector "that there was a federal statute that allowed for me to issue the permit." (Exh. D at 7). As a result, the building inspector failed to consider whether the proposed Hall was in compliance with other relevant sections of the Bylaw. Therefore, although counts II and IV of the Complaint arise under §10.1 and §5.1 of the Bylaws[5], respectively, rather than §9.18, for the purposes of this motion plaintiffs' contend that a finding that RLUIPA has been applied incorrectly mandates a grant of summary judgment in favor of plaintiff and remand to the ZBA on each of these counts.

RLUIPA requires St. Ann's to initially establish that the Bylaw substantially burdens religious exercise.[6] Only after making this threshold showing does the burden shift to Plaintiffs

---

[4] Count I alleges that St. Ann's was required to comply with or seek a variance from §9.18. Count II alleges that St. Ann's was required to comply with or seek a variance from §10. Count IV alleges that St. Ann's was required to comply with or seek a variance from §5.1. Count V alleges that St. Ann's was required to comply with M.G.L. c.40A §3. Count VI alleges that the building inspector and ZBA misapplied RLUIPA.

[5] §5.1 of the Bylaws require a non-conforming use to seek a special permit where the use is "changed, extended or enlarged." Plaintiffs assert in the Complaint that St. Ann's is non-conforming as to setbacks and height. §10.1 of the Bylaws require a use whose parking is non-conforming to comply with the Bylaws if the structure or use is enlarged. The Hall is an "enlarging" of the use under §5.1 and §10.1. This was not considered by the ZBA or the Building Inspector because of the application of RLUIPA. Therefore, this matter should, under Counts V and VI of the Complaint, be remanded to the ZBA for further consideration.

[6] Section 2000cc-(a) of RLUIPA, provides:

    (a) Substantial Burden

        (1) General rule:

to establish that the Bylaw is the least restrictive means of furthering a compelling government interest. 42 U.S.C. § 2000cc(a)(1)(A-B); C.L.U.B. v. City of Chicago, 342 F. 3d 752 (7th Cir. 2003); Cathedral Church of the Intercessor v. Incorporated Village of Malverne, 353 F. Supp.2d 375 (E.D.N.Y. 2005). Absent this showing, summary judgment should be granted to Plaintiffs. See San Jose Christian College v. City of Morgan Hill, 360 F.3d 1024 (9th Cir. 2004). (Ninth Circuit determined that challenge under RLUIPA could not survive city's summary judgment motion, where plaintiff could not demonstrate the requisite "substantial burden" on its religious practice). C.L.U.B., supra.[7]

### 1. RLUIPA is not intended to apply to the present case

The legislative history of RLUIPA shows that this law was only meant to be applied in cases where land use regulations were used to intentionally and substantially discriminate against religious assemblies. The impetus for the law was a pattern of religious discrimination which impinged upon a core aspect of religious exercise – the ability to assemble for worship. See Cong. Rec. S7774, S7775; H.R. Rep. 106-219, at 24. Congress was particularly concerned with a "widespread pattern...of discrimination against small and unfamiliar denominations as compared to larger and more familiar ones...." 146 Cong. Rec. S7775. Other testimony

---

No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly or institution:

    (A)    is in furtherance of a compelling governmental interest; and

    (B)    is the least restrictive means of furthering that compelling governmental interest.

[7] In terms of a dispositive motion, the present case seems to be unique procedurally in the RLUIPA context. Generally the religious entity challenges RLUIPA after either the complete or partial denial of a permit, or after being instructed to undergo an extensive variance or special permit process. Here St. Ann's did not seek a variance or special permit, despite authority holding that RLUIPA does not exempt religious uses from these requirements.

"revealed that some land use regulations deliberately exclude all churches from an entire city...The result of these zoning patterns is to foreclose or limit <u>new</u> religious groups from moving into a municipality." H.R. Rep. 106-219, at 19. (emphasis added). Congress also found that "banquet halls, clubs, recreation centers, museums and theaters are often permitted as of right where churches require a special use permit, or are allowed via special use permit where churches are wholly excluded." Id. At 19-20. This is the exact opposite of the present case, where, as demonstrated below, the Bylaws accord religious institutions favorable as of right status while similar and even less intensive uses require either a special permit or are excluded from residential zones completely. Despite Congress's stated intent to remedy discrimination, St. Ann's, a flourishing church over ninety years old, seeks relief under this statute (Exh. G p. 12).

2. <u>Plaintiffs cannot establish that complying with §9.18 presents a substantial burden under RLUIPA</u>

   a) <u>The denial of a permit to construct an accessory use to a house of worship cannot as a matter of law constitute a substantial burden under RLUIPA</u>

As demonstrated below, nearly every RLUIPA case addressing the burden element has revolved around the ability to have a place of worship. None have involved building a social hall to gather <u>after</u> worship. Aware of this, St. Ann's devotes a substantial part of its brief to arguing that its proposed uses of the Hall satisfies the element of religious exercise necessary for a <u>prima facie</u> case under RLUIPA. Assuming, <u>arguendo</u>, that St. Ann's has satisfied this element, an initial conclusion that the Hall is religious exercise cannot be bootstrapped into a finding that applying zoning regulations to the Hall is a burden on exercise.

The Seventh Circuit explained this limitation on the scope of the "substantial burden" element in <u>C.L.U.B. v. City of Chicago, supra at 761</u>:

9

"substantial burden on religious exercise" could be read to include the effect of any regulation that "inhibits or constrains the use, building, or conversion of real property for the purpose of religious exercise."...However, this cannot be the correct construction of "substantial burden on religious exercise" under RLUIPA. Application of the substantial burden provision to a regulation inhibiting or constraining *any* religious exercise, including the use of property for religious purposes, would render meaningless the word "substantial," because the slightest obstacle to religious exercise incidental to the regulation of land use--however minor the burden it were to impose-- could then constitute a burden sufficient to trigger RLUIPA's requirement that the regulation advance a compelling governmental interest by the least restrictive means. (emphasis in original)

See Konikov v. Orange County, 302 F. Supp.2d 1328, 1344 (M.D.Fla. 2004) (RLUIPA's "broad definition of 'religious exercise' does not, however, render the denial of a special exception under a zoning code a "substantial burden" on religious exercise"). Plaintiffs' contend that regulation of the uses contemplated by St. Ann's simply cannot meet the developing standard of substantial burden in the RLUIPA context. This is supported by the fact that the core issue before this court is not <u>whether</u> St. Ann's can conduct these activities – since it already is engaging in them - but <u>where</u>.[8]

The Supreme Court has defined "substantial burden" as where the state "puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." Thomas v. Review Board of the Indian Employment Section Division, 450 U.S. 707, 718 (1981). To show a substantial burden on the free exercise of religion, the religious adherent must prove that the government's action burdens the adherent's practice of his or her religion by preventing him or her from engaging in conduct or having a religious experience that the faith mandates. Bryant v. Gomez, 46 F.3d 948, 949 (9th Cir. 1995). Moreover, the burden must be more than an inconvenience; it must be substantial and interfere with a tenet or belief that is central to

---

[8] St. Ann's describes as "circular reasoning" any consideration of the fact that St. Ann's has flourished for 90 years without an adjacent social hall in the determination of "substantial burden" (St. Ann's Memorandum in Support of

religious doctrine. Bryant, 46 F.3d at 949. Pre-RLUIPA cases have held that zoning decisions do not generally impose a substantial burden on religious exercise. See Grosz v. City of Miami Beach, 721 F.2d 729, 739 (11th Cir.1983); see also Christian Gospel Church, Inc. v. City and County of San Francisco, 896 F.2d 1221, 1224 (9th Cir.1990); Messiah Baptist Church v. County of Jefferson, 859 F.2d 820, 824-25 (10th Cir.1988); Lakewood, Ohio Congregation of Jehovah's Witnesses, Inc. v. City of Lakewood, 699 F.2d 303, 306-07 (6th Cir.1983). These cases all considered whether the "religious exercise" implicated by zoning decisions was integral to a believer's faith.

The above test, developed in the pre-RLUIPA context of free exercise cases, cannot be met by St. Ann's. The absence or regulation of a social hall cannot seriously be asserted to cause any St. Ann's parishioner to "violate his beliefs", prevent conduct "the faith mandates" or interfere with a "central belief." This should be contrasted with the finding of substantial burden in Murphy v. Zoning Commission, 148 F.Supp.2d 173 (D.Conn. 2002), the only district court RLUIPA case cited by St. Ann's to support its argument of substantial burden. The court considered a cease and desist order issued by the town zoning enforcement officer to stop a large group from holding weekly prayer meetings in their home. The court found that the order represented a substantial burden because people who previously attended the prayer group meeting were no longer participating due to fear of arrest. Murphy at 114. Where, as here, a religious entity is already able to gather and worship, a zoning regulation which impedes or even prohibits the construction of an accessory social hall cannot satisfy the element of substantial burden under RLUIPA.

---

Motion for Summary Judgment "St. Ann's Memo" at 11). If so, the reverse must also be true. St. Ann's cannot claim it is "burdened" simply because it wants something that it does not or may not be able to have.

11

### b). Regulation of prohibition of the Hall presents only an inconvenience, not a substantial burden

A number of RLUIPA cases have held that inconvenience as to the place of practice does not constitute substantial burden. In <u>Midrash Sephardi, Inc. v. Town of Surfside</u>, 366 F. 3d 1214 (11th Circ. 2004), the city sought to enjoin synagogues from holding services in a hotel meeting room and conference room. The synagogues argued that the injunction constituted a substantial burden because the congregants, whose religious beliefs required them to walk to synagogue, would have had to walk further to a relocated synagogue. The plaintiff's claim of burden was analogous to St. Ann's:

> The inconvenience occasioned on these congregants would cause them to stop attending services altogether, significantly impairing the synagogues' operation. As a result, the congregations suggest that the significant decrease in attendance would require them to cease operations altogether, thereby creating an obvious substantial burden on their religious exercise.

<u>Id.</u> at 1227. The Eleventh Circuit rejected this contention:

> While we certainly sympathize with those congregants who endure Floridian heat and humidity to walk to services, the burden of walking a few extra blocks, made greater by Mother Nature's occasional incorrigibility, is not "substantial" within the meaning of RLUIPA.

<u>Id.</u> at 1228.

In <u>Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. City of West Linn</u>, 338 Ore. 453 (St. Ct. Ore. 2005), plaintiffs had to travel to an overcrowded meetinghouse in another town to worship. To relieve the crowding, the church sought to construct a meetinghouse in West Linn. The permit was denied on a number of grounds. The Oregon Supreme Court held:

> There is no evidence in the record to suggest that the crowded conditions at the meetinghouse have forced the church to turn away anyone who wished to attend church or to eliminate or reduce church activities. Nor is there any evidence in the record to suggest that the city's denial was motivated by religious animus.

(Id. at 467). The court noted that reapplying for a permit had "several adverse consequences for the church's effort to build a meetinghouse" and that resubmission would

> impose additional expenses on the church. It also will create delay, during which church members will continue to face crowded conditions at their Lake Oswego meetinghouse and the longer drive required to get there. <u>Those hardships, however, do not constitute "substantial burdens" under RLUIPA.</u> (emphasis added)

(Id. at 467). See <u>Konikov. v. Orange County, Florida</u>, 302 F.Supp. 2d 1328 (M.D.Fla. 2004) (worship impediments caused by physical limitations of synagogue's current location, i.e. lack of separate space for movement of late arriving congregants, for preparation for Kiddush or for allowing congregants to turn to face Jerusalem did not amount to substantial burdens).

The preceding cases demonstrate that impediments to the ability to worship are not sufficient for a finding of substantial burden. Consequently, some impediment to St. Ann's <u>non-</u>worship activities cannot be substantial burden. St. Ann's ability to worship – or to conduct baptisms, confirmations or other sacramental events on church property - will not be effected by the denial of the building permit. Only the ability to have a reception after these events is impacted. There is a fundamental distinction between conducting a religious service or sacramental event and holding a social gathering after that event. Courts have ruled that a desire for a specific location, however convenient, does not support a claim of burden. See <u>North Pacific Union Conference Ass'n of Seventh Day Adventists v. Clark County</u>, 118 Wash.App. 22, 74 P.3d 140, 147 (2003) (loss of a "highly visible and convenient location" did not constitute a substantial burden under RLUIPA. County's denial to build church/office building in agricultural district did not "interfere with a central belief of the Church's religious doctrine"); <u>Lighthouse Institute for Evangelism Inc. v. City of Long Branch</u>, 100 Fed. Appx. 70 (3d Cir. 2004), available at 2004 WL

13

1179268. (no substantial burden under RLUIPA where the institute had operated for years in rented space across the street from its proposed new location). See also C.L.U.B, supra at 761 ("in the context of RLUIPA's broad definition of religious exercise, a land-use regulation that imposes a substantial burden on religious exercise is one that necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise...effectively impracticable.); Midrash, supra at 1226 ("requires something more than an incidental effect on religious exercise... akin to significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly.")  In light of the above, Special Town Counsel's conclusory finding that applying §9.18 to St. Ann's "would meet the substantial burden element under RLUIPA" (Opinion Letter at p. 3) – which the building inspector relied on issuing the permit and which St. Ann's relies on to support its motion - is fundamentally incorrect.[9]  Even if the Hall was primarily for worship service, St. Ann's would not meet the test. Functions which they would like to have in the Hall are presently being held in the Church, the rectory or nearby locations. (Exh C).

St. Ann's has numerous viable alternatives.  It may build a similar Hall on its adjacent lot directly across the street.  This lot faces Main Street and could eliminate many of the safety, congestion and traffic issues. It can renovate the 4,170 square foot rectory which formerly housed two priests but now houses only one priest who divides his time between St. Ann's and the nearby parish of St. Vincent de Paul in Lenoxdale (Exh. A p. 9; Exh. G p. 14).  It could obtain space in town, move the priest out of the rectory entirely to the 3,558 rectory in Lenoxdale or purchase a small home on St. Ann's Avenue for the priest. It should be noted that the "majority" of the rectory in Lenoxdale is used for the housing and "quite large" office of a priest who is a Diocesan

---

[9] Special Town Counsel relied on prisoner context free exercise cases that pre-dated RLUIPA in reaching his conclusion. (Opinion Letter at p. 2) citing, Reese v. Coughln 1996 U.S. Dist. LEXIS 9206 (SDNY, 1996) and Jolly

official and does not serve the local parish. (Exh. G, p. 66-67) It also declined to purchase the building in town which was formerly used as a Parish Hall (Exh. C, p. 10).

It is clear that the Hall is only a desired convenience. As the pastor acknowledged:

> the vast majority of voices in our parish have unequivocally said the same thing, and that is if it's not on our property, we might as well go home. We don't want to drive to another destination. We don't want to go to Lenoxdale. We don't want to go around the corner.

(Exh G, pp 128-129) In light of these facts, and the fact that St. Ann's has functioned for so long and so well without the Hall, St. Ann's cannot establish the element of substantial burden under the judicial standard set forth above.

### 3. Section 9.18 is not discriminatory[10]

Subsection 2000cc-(b) of RLUIPA provides:

> No government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a non-religious assembly or institution.

St. Ann's asserts that the combined setback and lot coverage regulations of §9.18 are discriminatory to the extent that a similar use, such as a library, museum or professional office,

---

v.Coughlin, 76 F.23d 468, 476 (2d. Cir., 1996).

[10] Section 9.18 of the Bylaw provides, in relevant part, as follows:

> 9.18    EDUCATIONAL/RELIGIOUS USES
> Any non-municipal educational use or any religious use is subject to the following regulations:
>    (a) Maximum building height – 2 stories or 35 feet
>    (b) Maximum building coverage – 4%
>    (c) Setback – two hundred (200) feet buffer surrounding the property to be kept undeveloped except for entrance and exit roadways...
>    (g) Parking requirements:
>       1. Places of assembly: 1 space for every three (3) seats.

could be located in the same area without complying with these setback and coverage requirements.[11] These claims are based on a misreading of the Bylaws. St. Ann's and Town Counsel ignore the crucial fact that § 9.18 provides **as right use.** If the criteria of §9.18 are met, a permit is granted, in any zone, without review by the ZBA. In contrast, the uses they cite, to the extent even allowed in the R-15 zone, all require a Special Permit under the Bylaw Use Table. (Table 6.6-1.) A Special Permit is always more restrictive – and hence more discriminatory – than an as of right use. In Freedom Baptist Church of Delaware County v. Township of Middletown, 204 F. Supp 857, 862 (E.D.Pa. 2002) the court noted that many "codes permit churches only with individualized permission from the zoning board and zoning boards use that authority in discriminatory ways.") As the Eleventh Circuit noted special permits constitute "individualized assessments" which fall under strict scrutiny:

> The SZO requires each church and synagogue to apply for a CUP prior to operating in Surfside. This assessm2ent procedure, which results in a case-by-case evaluation of the proposed activity of religious organizations, carries the concomitant risk of idiosyncratic application of SZO standards. Surfside officials may use their authority to individually evaluate and either approve or disapprove of churches and synagogues in potentially discriminatory ways. Thus, SZO is quintessentially an "individual assessment" regime vis-à-vis churches and synagogues.

Midrash, supra at 1225. See Bible Speaks v. Board of Appeals of Lenox, 8 Mass. App. Ct. 19, 32-34 (1979);

The extensive criteria for issuing a Special Permit are set forth in Sections. 6.1.1 and 6.1.2 of the Bylaws. Section 6.1.1 contains five subsections which must be satisfied before a special permit can be issued, including a finding that the use "will not be detrimental to adjacent uses or to the established or future character of the neighborhood" (Bylaw § 6.1.1(c)) and that the

---

[11] *Special Town Counsel asserts that the Bylaw would "permit the use of the Church site for a municipal use, private nonprofit library or museum, post office or medical professional offices." (Opinion Letter at p. 3).*

use "will not create undue traffic congestion, or unduly impair pedestrian safety" (§ 6.1.1(d)). Section 6.1.2 grants the ZBA with wide discretion in terms of restrictions it may impose as part of the Special Permit. These include "limitations upon the size, number of occupants, method and time of operation, time duration of the permit, or extent of the facilities" and "front, side and rear yards greater than the minimum required by this Bylaw". The ZBA could easily impose more restrictive setback and lot coverage requirements than Section 9.18 and is given broad authority to so under Section 6.3 of the Bylaw.[12] Therefore, the uses cited by Special Town Counsel and St. Ann's as being subject to less restriction – libraries and museums - would in fact be subject to substantially more stringent requirements than St. Ann's.[13] Most importantly, the Special Permit could be denied, where no such discretion to deny exists under §9.18.

The Bylaw lacks any reference to "assemblies" that could serve as a standard for defining equal treatment. Analogous uses would allow at least 150 people to congregate and allow food, alcohol and music to be provided. The only uses that come close are set forth in the Use Table at 6.6-1(B)(13-17): a private club or lodge, recreation facility, bowling alley, live theater or movie theater. In <u>Midrash</u>, <u>supra</u>, the 11th Circuit held that a private club – not the museum or library suggested by St. Ann's – is most similar to a church.

> The SZO's definition of private club comports with a natural and ordinary understanding of "assembly" as a group gathered for a common purpose. Like churches and synagogues, private clubs are places in which groups or individuals dedicated to similar purposes--whether social, educational, recreational, or otherwise--can meet together to pursue their interests. We conclude therefore that churches and synagogues, as well as private clubs and lodges, fall within the natural perimeter of "assembly or institution."

---

[12] *Section 6.3 provides "A use designated in the TABLE by the letters "XA" may be permitted as a special exception only if the Board of Appeals so determines and grants a special permit therefor as provided in Section 11 of this Bylaw **subject to such restrictions as are set forth elsewhere in this Bylaw, and such restrictions as said Board may establish** (See Section 9 and 11.) See also Sections 6.4.1, 9.21, 10.11, and 13.2.2 for Special Permits and Site Plan Approval. (emphasis added.)*

[13] *A private nonprofit library and a private nonprofit museum must also petition the Planning Board, must meet the extensive parking standards of 10.11 and finally must also conform to the detailed General Design Review Standards of Section 9.21 (Table 6.6-1(B)(7)and(8)). None of this is required of St. Ann's.*

Id at 1231.

The Bylaws prohibit private clubs in a residential zone and require a special permit even in a commercial zone.[14] In contrast, §9.18 allows religious uses as of right in all zones. Therefore the Bylaws in general, and §9.18 in particular, clearly satisfy RLUIPA's mandate to treat a "religious assembly" on equal terms with a non-religious assembly.

This is supported by the court's finding in Bible Speaks, supra., where the court reviewed the identical Lenox zoning bylaw at issue here in light of the Dover Amendment. As discussed more fully infra, the Dover Amendment mirrors RLUIPA in that it protects religious uses from discriminatory zoning but allows the application of reasonable land use regulations.[15] At the time of the Bible Speaks case, Section 9.18 required a proposed religious use to submit an extensive site plan and to apply for a special permit. The court struck this requirement but specifically upheld the validity of the dimensional requirements of Section 9.18: "...those portions of the Lenox zoning by-law...imposing bulk, dimensional, and parking requirements are valid" Bible Speaks, supra at 34. The court went on to strike the special permit requirement as improperly granting the ZBA " a considerable measure of discretionary authority" which could have a discriminatory effect:

> The by-law also, as a practical matter, would enable the board to exercise its preferences as to what kind of educational or religious denominations it will welcome, the very kind of restrictive attitude which the Dover Amendment was intended to foreclose.

---

[14] St. Ann's expects to serve food, as well as beer and wine, at many functions (Exh G, pp 125-127) "Eating places" that serve food and beverages are not allowed at all in residential zones. (Bylaw Table 6.6-1(E)(4)). An "eating place" which is accessory to a permitted use is also excluded from residential areas and requires a special permit in commercial zones. (Bylaw Table 6.6-1(G)(13)).
[15] The Abutters assert infra that the Dover standard is at least as protective of religious use as RLUIPA and its application is not preempted by RLUIPA.

18

Bible Speaks, supra, at 33. Lenox subsequently changed Section 9.18 from special permit to as of right status in order to treat religious uses more favorably than other similar uses.

### 4. Section 9.18 furthers a compelling governmental interest and is the least restrictive means of furthering that interest

Under RLUIPA, even if St. Ann's is substantially burdened by §9.18 of the Bylaw, the Bylaw may still be applied if the imposition of the burden:

(A) is in furtherance of a compelling governmental interest; and

(B) is the least restrictive means of furthering that compelling governmental interest.

Special Town Counsel contended that if the purpose of §9.18 is to protect the neighborhood from excessive traffic, preserve safety and maintain open space, then §9.18 fails in that the Bylaw allows "uses which have, arguably, equal or greater impacts on the protected interest." (Opinion Letter at p. 3); He then concluded that §9.18 cannot be "compelling" or "least restrictive." This argument is based on a misreading of the Bylaws. Special Town Counsel's Opinion Letter did not examine the "many other uses" of the Church site. (Opinion Letter at p. 3).[16] Had he performed this analysis, he could not have failed to conclude, as demonstrated earlier, that the special permit, site plan and additional zoning requirements necessary for these uses, e.g. museums and libraries, are far more restrictive than the favorable – and judicially endorsed in Bible Speaks – regulations set forth in Section 9.18. Therefore the contention that Section 9.18 cannot further a compelling interest is simply wrong. Similarly, Section 9.18, because it removes the ZBA's discretionary power, is clearly the least restrictive means of regulation. With non-religious uses, the ZBA has extensive discretion to consider adverse impact, deny a permit based on that impact and/or impose substantial restrictions for these uses.

---

19

Section 9.18 also contains parking requirements which are identical to the general parking regulations for "Restaurants, theaters and other places of assembly." ( Bylaw §9.18(g) and §10.6). Since the parking regulations treat all places of assemblies on "equal terms" (RLUIPA at 2000cc-(b)(1)) St. Ann's cannot claim it is being unfairly restricted as to parking. The severe lack of adequate parking around St. Ann's and the increase in safety hazards that will result from the construction of the social hall are of paramount concern to Plaintiffs. Similar concerns were raised by abutters in Murphy, supra, and the court, specifically considering RLUIPA, found that

> "defendants' interests in health, safety, and traffic are compelling under the facts of this case...defendants have shown a compelling interest in enforcing the town's zoning regulations and ensuring the safety of residential neighborhoods."

Id. at 189-90. See also H.O.P.E. Word Church of Christ v. Village of Lockland, 797 N.E.2d 548, 553 (Ohio App. 2003) ("Given the rather obvious public-safety issues involved in such public uses as schools, hospitals, and churches, the village would have been capable of articulating any number of valid, if not compelling, reasons for its additional regulations.") In Konikov, the district court, relying on the Eleventh Circuit decision in Grosz v. City of Miami Beach, 721 F.2d 729 (11th Cir. 1983) held that a zoning ordinance which barred religious organizations in a specific zone furthered a compelling government objective of encouraging peaceful and safe residential areas, and was the least restrictive means of furthering the objective:

> Gatherings for organized religious services produce, as do other substantial gatherings of people, crowds, noise and disturbance...the government action in this case easily passes the least restrictive means test.

Konikov, supra at 1340. The setback and density provisions of §9.18 further this same objective.