UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DANIEL MINTZ; ANDREA WINTER; )
JAMES and SANDRA BIANCOLO; )
ANN PHILLIPS; STEVEN BAUM; )
CAROL WINSTON; VERNON and )
DONNA KOHLENBERGER; )
LAWRENCE and PAMELA WOLFE; )
CRAIG and MELISSA PEHLERT; and )
ROBERT and JANE HACKMANN, )
                Plaintiffs )
)
)
       v.                    ) Civil Action No. 04-10809-KPN
)
)
)
ROMAN CATHOLIC BISHOP OF )
SPRINGFIELD, THOMAS L. DUPRE, )
BISHOP; ARLENE D. SCHIFF, )
CLIFFORD SNYDER, HAROLD )
BROWN, JEFF HALL and NED )
DOUGLAS; and EDWIN MAY, )
                Defendants )

MEMORANDUM AND ORDER WITH REGARD TO CROSS
MOTIONS FOR SUMMARY JUDGMENT (Document Nos. 23 and 26)
March 30, 2006

NEIMAN, C.M.J.

      This is an appeal by a number of home owners ("Plaintiffs") in Lenox, Massachusetts, of a March 5, 2004 decision by the Lenox Zoning Board of Appeals pertaining to property owned by the Roman Catholic Bishop of Springfield ("the diocese"). Plaintiffs, who are abutters to the property, have sued the diocese, members of the Zoning Board of Appeals ("the ZBA") and Lenox's Assistant Building Inspector Edwin May ("May") (together "Defendants"). The appeal was originally filed in the Massachusetts Land Court pursuant to Mass. Gen. L. ch. 40A, § 17. It was thereafter

removed to federal court by Defendants because Plaintiffs based part of their appeal on questions arising under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.*, and the United States Constitution.

The parties have consented to this court's jurisdiction pursuant to 28 U.S.C. § 636(c).  Presently before the court are Plaintiffs' and the diocese's cross motions for summary judgment, which motions walk the fine line between the rights of religious institutions under RLUIPA and the concerns of abutters.  The ZBA and May have remained silent, evidently content to have the diocese carry their arguments.  For the reasons which follow, the court will allow the diocese's motion for summary judgment, apply that ruling to the remaining defendants (the ZBA and May), and deny Plaintiffs' cross motion for summary judgment.

I. BACKGROUND

The following background comes primarily from the diocese's Local Rule 56.1 statement (Document No. 25, hereinafter "Def.'s Facts") and Plaintiffs' counter statement (Document No. 27, hereinafter "Pls.' Facts").  Unless otherwise noted, the facts which follow are undisputed.

The diocese is the owner of land in Lenox (hereinafter "the town") which contains a church and rectory known as St. Ann's Parish ("St. Ann's").  (Def.'s Facts ¶ 1.)  The property is located near the center of town in an area zoned "R-15," *i.e.*, residential with a minimum lot size of 15,000 square feet.  (*Id.* ¶ 2.)  Religious uses are permitted within the R-15 zone.  (*Id.* ¶ 3.)  According to Plaintiffs, during church services and functions, cars and parishioners "regularly park on the street in violation of posted 'no parking' areas" and "regularly block traffic while entering and exiting St. Ann's property."  (Pls.'

Facts ¶¶ 1, 2.) The diocese disputes these characterizations.

The instant controversy centers around St. Ann's proposal in 2003 to construct a parish center which would include a 150-person social hall, a kitchen, office space, and handicap-accessible bathrooms. (See Def.'s Facts ¶¶ 11, 17; Pls.' Facts ¶ 3.) Some years ago, St. Ann's did not purchase another parish center in town when it became available. (Pls.' Facts ¶ 8). Apparently, its parishioners did not want to travel any distance to a parish center. (*Id.* ¶ 9.)

St. Ann's rectory used to house two priests but presently houses only one. (*Id.* ¶ 6.) Since 1987, St. Ann's priest also pastors another church in town, St. Vincent de Paul. (*Id.* ¶ 7.) Currently, however, the rectory holds three offices: one for the pastor, one for an administrative assistant, and one for the director of religious education (which is located in a former bedroom on the second floor). (Def.'s Facts ¶¶ 7, 9.) Meetings are also held in the rectory's living, dining room and kitchen, although the parish council must often meet at an outside location because of its size. (*Id.* ¶¶ 8, 10.) The new parish center, in the diocese's view, would alleviate these concerns.

Section 9.18 of the town's zoning bylaw ("the bylaw") contains the following provisions which apply only to religious and private educational uses:

> Any non-municipal educational use or any religious use is subject to the following regulations:
>
> (a) Maximum building height - 2 stories or 35 feet.
>
> (b) Maximum building coverage - 4%
>
> (c) Setback - two hundred (200) feet buffer surrounding the property to be kept undeveloped except for entrance and exit roadways.

> (d) Major access roads and major parking areas subject to frequent use day or night shall be paved. Major roads are to be eighteen (18) feet wide and shall not exceed a 7½% grade.
>
> (e) Parking areas shall be screened as provided in Section 2: DEFINITIONS - SCREENING - (a) and (c).
>
> (f) Parking areas shall be within three hundred (300) feet of the building to be served.
>
> (g) Parking requirements:
>
>> 1. Places of assembly: 1 space for every three (3) seats.
>>
>> 2. Classrooms and/or dormitories:
>> Grade 1-10   1 space for each staff member[.]
>> Grades 10-12 1 space for each staff member plus 1 space for every two students.
>> College 1 space for each staff member plus two (2) spaces for every three (3) students.

(Def.'s Facts ¶ 13. A copy of the bylaw is attached as Def.'s Ex. 1.)

Of particular relevance here is the "maximum building coverage" restriction of four percent since, according to the diocese, the proposed parish center would contain about 3,370 square feet and, accordingly, cover more than four percent of the diocese's property. (See *id.* ¶¶ 12, 14. See also Complaint ¶ 29 (indicating that if the proposed parish center were built, the lot's total building coverage will be thirteen percent).) Other uses regulated by the bylaw have maximum building coverage restrictions in the range of five to thirty-five percent. (See Def.'s Facts ¶ 15; Def.'s Ex. 1 §§ 8.4, 9.14.1.) For their part, Plaintiffs note that the current rectory is 4,170 square feet while the rectory at another church in town (St. Vincent de Paul, which is occupied by a diocesan official) is only 3,558 square feet. (Pls.' Facts ¶¶ 5, 6.)

Several other bylaw provisions related to section 9.18 are also relevant here. For example, section 10.6, like section 9.18, mentions a "three to one" parking ratio for places of assembly, *i.e.*, one parking space for "each three seats." (See Def.'s Ex. 1 §§ 9.18(g)(1) and 10.6.) Sections 8.1 and 8.2 concern frontage and lot width requirements. (*Id.* §§ 8.1 and 8.2.) And section 5.1 provides that a non-conforming use or structure shall not be changed, extended or enlarged in any manner, unless the ZBA grants a special permit, the requirements for which are described in section 5.5. (*Id.* §§ 5.1 and 5.5.)

In 2000, several years prior to the events at bar, Congress passed RLUIPA. (Def.'s Facts ¶ 16.) Three years later, on October 8, 2003, St. Ann's applied for a building permit for the parish center. (*Id.* ¶ 17.) Given that the plans themselves could not conform to section 9.18, the diocese filed a legal brief with the building inspector contending that RLUIPA required that the town not enforce the bylaw and, therefore, that the permit be granted. (*Id.* ¶ 18.) This prompted May, as assistant building inspector, to request an opinion from special town counsel. (*Id.* ¶ 19.)

On November 20, 2003, special town counsel, David Dubendorf ("Dubendorf"), issued an opinion that section 9.18 of the bylaw violated RLUIPA and, therefore, that the permit should be granted. (*Id.* ¶¶ 20, 21.) In pertinent part, Dubendorf's opinion letter provided as follows:

> Keeping in mind that RLUIPA commands us to construe the statute broadly in favor of religious exercise, it does appear that § 9.18 of the Bylaw prevents St. Ann's from "engaging in conduct . . . that is central to [its] religious doctrine," and that the application of § 9.18 is "more than an inconvenience" to St. Ann's. Therefore, it is our opinion that St. Ann's would meet the substantial burden element under RLUIPA.

5

> . . . .
>
> . . . [I]t is difficult to see what th[e] compelling interest [of the town] might be in light of the uses allowed at the Church site under the Bylaw.  If the Town's compelling interest was to protect the health, safety and general welfare of the Town's inhabitants by reducing traffic and minimizing activity in that general area, it is unclear why then the Bylaw would permit the use of the Church site for a municipal use, private nonprofit library or museum, post office or medical professional offices. . . . As such, it is difficult to support the position that § 9.18 of the Bylaw furthers a compelling governmental interest. . . .
>
> The Town of Lenox would also have a struggle in withstanding a challenge to the discriminatory nature of § 9.18. . . . [I]t is our opinion that § 9.18 of the Bylaw violates the anti-discrimination provision of RLUIPA.

(A copy of the opinion letter is attached as Def.'s Ex. 3(E).  See also Def.'s Facts ¶ 21.) May issued a permit on November 26, 2003, albeit with a condition that, to conform to parking regulations, the parish center and the church could not operate at the same time.  (Def.'s Facts ¶ 22.)

On December 18, 2003, Plaintiffs filed an appeal with the ZBA.  (*Id.* ¶ 23.)  They asserted that the building permit should be revoked as violating various sections of the bylaw.  (*Id.*)  Hearings were held over three days, the first being January 21, 2004.  (*Id.* ¶ 24.)  That day, as described by Plaintiffs, there were comments by St. Ann's officials and parishioners, presentations by both Philip Heller, the attorney who had submitted the diocese's legal brief, and Dubendorf, the special town counsel who had issued the opinion letter to May, and testimony by May himself.  (See Complaint ¶ 21; Document No. 28, hereinafter "Pls.' Brief," at 4-5.)  In addition, Plaintiffs' counsel submitted a letter. (Complaint ¶ 21 and Ex. H.)  The hearings continued on February 12th and 26th.

6

(Complaint ¶¶ 21 and 22.) Following the hearings, the ZBA voted 5-0 to uphold the building permit (including the condition that the parish center and church not operate at the same time) and required as well that fifty additional parking spaces be added to the site. (See *id.* ¶ 23; Def.'s Facts ¶ 25.)

Litigation ensued. As indicated, Plaintiffs filed their complaint, containing eight causes of action, in the Massachusetts Land Court on March 23, 2004. The First, Second, Third and Fourth Causes of Action (hereinafter "Counts I through IV") allege that "[May] and the ZBA exceeded their authority and acted unreasonably in not requiring the Diocese to comply with Section 9.18" and the related bylaw provisions concerning building coverage and setbacks (Count I), parking (Counts I and II), frontage and lot width (Count III), and permitting (Count IV). (Complaint ¶¶ 32, 40, 45 and 50.) The Fifth Cause of Action (hereinafter "Count V") alleges that "[May] and the ZBA exceeded their authority and acted unreasonably in failing to consider the reasonable regulations set forth in [Mass. Gen. L. ch. 40A, § 3]." (*Id.* ¶ 57.) The Sixth Cause of Action (hereinafter "Count VI") alleges that "[May] and the ZBA exceeded their authority and acted unreasonably in failing to consider the evidence necessary to determine that the [bylaw was] preempted by RLUIPA." (*Id.* ¶ 62.) The Seventh Cause of Action (hereinafter "Count VII") alleges that the application of RLUIPA by May and the ZBA to the building permit was "unconstitutional for, among other [sic], the fact that it (i) violates the Establishment Clause of the First Amendment of the United States Constitution and (ii) constitutes a taking of [Plaintiffs'] property in violation of the Fifth and Fourteenth Amendments of the United States Constitution." (*Id.* ¶ 65.) Finally, the Eighth Cause of Action (hereinafter "Count VIII") alleges that "[May] and the ZBA exceeded their

authority and acted unreasonably in failing to refer the Diocese permit application to the Historic District Commission prior to granting or upholding the building permit." (*Id*. ¶ 72.)

Since the complaint raised a federal question with regard to RLUIPA, Defendants removed the action to this court on April 23, 2004. In due course, the diocese and Plaintiffs filed cross motions for summary judgment and the court heard oral argument.

## II. SUMMARY JUDGMENT STANDARDS

When ruling on a motion for summary judgment the court must construe the facts in a light most favorable to the nonmoving party. *Benoit v. Tech. Mfg. Corp.*, 331 F.3d 166, 173 (1st Cir. 2003). Summary judgment is appropriate when "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" when the evidence is such that a reasonable fact-finder could resolve the point in favor of the nonmoving party, and a fact is "material" when it might affect the outcome of the suit under the applicable law. *Morris v. Gov't Dev. Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir. 1994). The nonmoving party bears the burden of placing at least one material fact into dispute after the moving party shows the absence of any disputed material fact. *Mendes v. Medtronic, Inc.*, 18 F.3d 13, 15 (1st Cir. 1994) (discussing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). The mere fact that both parties move for summary judgment does not change the foregoing analysis. *United Paperworkers Int'l Union, Local 14 v. Int'l Paper Co.*, 64 F.3d 28, 32 n.2 (1st Cir. 1995).

## III. DISCUSSION

The court will first consider the diocese's motion for summary judgment and then

turn to Plaintiff's cross motion.  In the end, the court will conclude, for the reasons described, that the diocese, as well as the ZBA and May, are entitled to summary judgment, while Plaintiffs are not.

It should be noted at the outset, however, that the particular alignment of the parties -- an appeal by abutters against both the landowner and the zoning board -- is somewhat unique.  In the more common case involving RLUIPA and land use, a religious organization is pitted against a governmental entity that has allegedly treated that organization on less than equal terms than non-religious organizations or has discriminated against that organization on the basis of religion.  Here, however, the usual protagonists are allied.  The diocese is not complaining about the ZBA's treatment of its application for a building permit nor is it contesting the conditions set for that permit.  In fact, the diocese and the ZBA agree that the parish center falls within the "religious exercise" of St. Ann's adherents and that the bylaw -- which would prevent the construction of the parish center as proposed -- imposed a "substantial burden" on that exercise.  Thus, in contrast to the usual scenario, the complaining parties here are abutters to the religious institution who believe that the governmental entity failed to properly fulfill its obligations under a zoning bylaw and applicable state statutes.

A.  THE DIOCESE'S MOTION FOR SUMMARY JUDGMENT

The court divides its discussion of the diocese's motion into six parts.  First, the court will consider, and reject, the diocese's argument that a 2005 amendment to the bylaw renders most of Plaintiffs' claims moot.  Second, given the gravity of the charge, the court will address Plaintiffs' claim in Count VII that RLUIPA is unconstitutional.  Third, the court will discuss the standard of review applied to zoning appeals.  Fourth,

reaching the heart of the case, the court will apply that standard to Counts I, II and IV (and parts of Counts V and VI), *i.e.*, Plaintiffs' causes of action which challenge the ZBA's decision with respect to section 9.18 of the bylaw and its related provisions, hereinafter the "bylaw counts." That process necessarily entails a detailed consideration of RLUIPA. Fifth, the court will discuss the remaining issues arising under Counts V and VI. And finally, the court will address Plaintiffs' last claim, Count VIII.[1]

    1. <u>New Bylaw</u>

On May 5, 2005, the bylaw was amended at the Annual Town Meeting to add the following provision, section 9.18.1: "Any property located in the Commercial C Zone or Residential R-15 Zone used primarily for religious purposes shall be exempt from the provisions of this Section 9.18." (Def's Facts ¶ 26.) In its memorandum of law, the diocese noted that the amendment had yet to be approved by the Attorney General. At oral argument, however, Plaintiffs informed the court that approval had since been received.

In any event, the diocese asserted on the final page of its memorandum of law that, as a result of the amendment, the "burdensome and discriminatory provisions" of the bylaw would be eliminated and, accordingly, that most of Plaintiffs' causes of action were moot. Plaintiffs disagreed, asserting that the diocese's permit can only be judicially reviewed with respect to the existing, *i.e.*, the original, bylaw. If the diocese believed that the amendment has mooted the substantive claims, Plaintiffs averred, it

---

    [1] Plaintiffs conceded at oral argument that they are no longer pursuing Count III since the plan filed with the permit apparently shows more than enough frontage and width for the proposed parish center. Accordingly, the diocese's motion with respect to Count III will be allowed.

should withdraw its permit and voluntarily dismiss the action.

Such a dismissal, of course, would require the diocese to recommence the zoning process. As the diocese points out, however, the instant dispute is not a situation where St. Ann's has applied for and been denied a permit under a provision that was later repealed. In other words, the new bylaw does not moot any of Plaintiffs' claims. Moreover, the exact effect of the new bylaw is uncertain at this time. Since neither side wishes to budge from their present postures, the court has little choice but to address Plaintiffs' claims under the pre-existing bylaw in accordance with the standard of review.

2. Constitutionality of RLUIPA (Count VII)

As described, Count VII seeks a declaration that RLUIPA's land use provisions are unconstitutional. In their memorandum of law, however, Plaintiffs state merely that "there is insufficient consensus on this issue to merit a ruling on summary judgment." (Pl.'s Brief at 25-26.) Putting aside for the moment whether such a "consensus" actually would resolve the issue for this court, Plaintiffs have bypassed the issue entirely and have pursued their remaining arguments on the assumption that RLUIPA is constitutional. The diocese, of course, deems RLUIPA constitutional.

Given Plaintiffs' position in particular, there is no reason why the court should not assume RLUIPA's land use provisions constitutional. That, in fact, appears to have been the position of nearly every court which has considered the issue. *See, e.g., Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1237-43 (11th Cir. 2004) (examining issues in detail and holding RLUIPA constitutional); *San Jose Christian College v. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004) (assuming RLUIPA's

11

constitutionality based on earlier Ninth Circuit case involving prisoner rights); *Cottonwood Christian Ctr. v. Cypress Redev. Agency*, 218 F. Supp. 2d 1203, 1221 n.7 (C.D. Cal. 2002) (noting that RLUIPA appears to have avoided constitutional pitfalls of RFRA); *Freedom Baptist Church v. Twp. of Middletown*, 204 F. Supp. 2d 857, 863 (E.D. Pa. 2002) (holding that RLUIPA is constitutional in first case to address the issue). Plaintiffs cite only one decision from the Central District of California deeming RLUIPA's land use provisions unconstitutional, *see Elsinore Christian Ctr. v. City of Lake Elsinore*, 291 F. Supp. 2d 1083, 1096-1104 (C.D. Cal. 2003), but that district court ruling came prior to the Ninth Circuit's *San Jose Christian College* decision. For its part, the Supreme Court recently upheld as constitutional that part of RLUIPA which deals with institutionalized persons. In doing so, the Court reaffirmed "that there is room for play in the joints between the Free Exercise and Establishment Clauses, allowing the government to accommodate religion beyond free exercise requirements, without offense to the Establishment Clause." *Cutter v. Wilkinson*, 544 U.S. 709, 125 S. Ct. 2113, 2117 (2005) (citations and internal quotation marks omitted). Accordingly, the diocese's motion with respect to Count VII will be allowed.

    3. <u>Standard of Review</u>

The standard for reviewing a local zoning board decision pursuant to Mass. Gen. L. ch. 40A, § 17 is well established. In essence, the court is required to hear *de novo* all issues raised on appeal, make independent findings of fact and determine the legal validity of a zoning board's decision upon the facts found. *See Roberts v. Southwestern Bell Mobile Sys., Inc.*, 709 N.E.2d 798, 804 (Mass. 1999) (citing *Josephs v. Bd. of Appeals of Brookline*, 285 N.E.2d 436, 439 (Mass. 1972)). A zoning board's decision

carries no particular evidentiary weight on appeal. *Id.* However, in order to set aside a zoning board's decision, the court must find, in light of all the evidence, that the decision was "based on a legally untenable ground, or is unreasonable, whimsical, capricious or arbitrary." *MacGibbon v. Bd. of Appeals of Duxbury*, 255 N.E.2d 347, 350 (Mass. 1970) (citation omitted).

As it turns out, the parties here rely on a summary judgment record with few facts offered *de novo*. The court is also hampered somewhat by not having before it a transcript of the ZBA hearings (other than one snippet). When necessary, therefore, the court relies on the parties' descriptions of those hearings. In any event, as will be made clear, the parties raise primarily questions of law. Accordingly, the court will consider Plaintiffs' various claims pursuant to the standards articulated in Mass. Gen. ch. 40A, § 17, focusing, as necessary, on the decision of the ZBA. Moreover, since the court's analysis is framed initially within the context of the diocese's motion for summary judgment, the court will consider any factual disputes which might surface in a light most favorable to Plaintiffs.

    4. <u>The Bylaw Counts (Counts I, II and IV as well as Counts V and VI)</u>

Counts I, II and IV target section 9.18 and the related bylaw provisions concerning building coverage, setbacks, parking and permitting. Analysis of those claims -- as well as Counts V and VI insofar as they, too, implicate the bylaw -- necessarily entails a detailed consideration of RLUIPA. Plaintiffs assert in broad terms that each of these counts arises out of the misapplication of RLUIPA by the town. The essence of their argument is that the ZBA "exceeded [its] authority and acted unreasonably in not requiring the diocese to comply with" the bylaw. In particular,

Plaintiffs assert that it was erroneous for the ZBA to conclude, as it did, that section 9.18 violated RLUIPA. The diocese, of course, disagrees, arguing that section 9.18 violated RLUIPA in a variety of ways and that, as a result, the ZBA acted appropriately. In the court's opinion, the diocese's argument is more persuasive.

      a. *The Statutory Scheme*

RLUIPA is the successor to the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb *et seq.*, enacted in 1994 and then declared partially unconstitutional, *see City of Boerne v. Flores*, 521 U.S. 507, 536 (1997). It is, however, "narrower in scope, in that it applies only to governmental actions affecting land use and institutionalized persons, and establishes several jurisdictional limitations not included in RFRA." *Regulating Historic Religious Properties Under RLUIPA (NTHP Preservation Law Reporter Education Materials, 2005)*, SL014 ALI-ABA 719, 722 (Nov. 2005). Taken together, these limitations represent Congress' attempt to overcome the Supreme Court's concerns when it declared RFRA unconstitutional as applied to state and local governments. *See id.*[2]

Several RLUIPA provisions are arguably at issue in the present dispute. The

---

[2] Congress dealt with *Boerne* in at least two ways. *Id.* First, it built a legislative record of land use discrimination against religious institutions. *See id.* at 722-23. Second, it sought to overcome certain jurisdictional issues by requiring that the substantial burden on religious exercise result from state or local governmental activities that received federal financial assistance, affected commerce with foreign nations, or were imposed by a land use regulation that has procedures or practices in place that permit the government to make individualized assessments of the proposed uses for the property involved. *See id.* at 723; 42 U.S.C. § 2000cc(a)(2)). RFRA, it should be noted, still applies to the federal government. *See Regulating Historic Religious Properties Under RLUIPA*, SL014 ALI-ABA at 722 n.1.

main portion of the statute, section 2000cc entitled "Protection of land use as religious exercise," bars governments from imposing a "substantial burden" on religion with respect to certain land use regulations:

> (1) . . . No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution--
>
> (A) is in furtherance of a compelling governmental interest; and
>
> (B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc(a)(1).  Section 2000cc continues with certain "equal terms," "nondiscrimination" and "unreasonably limits" provisions:

> (1) Equal terms[.]  No government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution.
>
> (2) Nondiscrimination[.]  No government shall impose or implement a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination.
>
> (3) Exclusions and limits[.]  No government shall impose or implement a land use regulation that--
>
> (A) totally excludes religious assemblies from a jurisdiction; or
>
> (B) unreasonably limits religious assemblies, institutions, or structures within a jurisdiction.

42 U.S.C. § 2000cc(b).  Finally, another portion of RLUIPA, which the parties also cite, allows for "[g]overnmental discretion in alleviating burdens on religious exercise":

> A government may avoid the preemptive force of any provision of this chapter by changing the policy or practice that results in a substantial burden on religious exercise, by retaining the policy or practice and exempting the substantially burdened religious exercise, by providing exemptions from the policy or practice for applications that substantially burden religious exercise, or by any other means that eliminates the substantial burden.

42 U.S.C. § 2000cc-3(e).

      b.  *Does the Bylaw Pose a Substantial Burden on Religious Exercise?*

With regard to RLUIPA, Plaintiffs first argue that is was improper for the ZBA to have concluded that the bylaw, which the parties agree would bar the construction of the parish center as proposed, imposed a "substantial burden" on the diocese's "religious exercise."  The court separately addresses the two subparts of this argument: (1) whether the diocese's "religious exercise" was involved; and (2) if so, whether the bylaw would impose a "substantial burden" on that exercise.

      (i)  Religious Exercise

RLUIPA defines "religious exercise" as follows:

> (A) In general[.]  The term "religious exercise" includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief.
>
> (B) Rule[.]  The use, building, or conversion of real property for the purpose of religious exercise shall be considered to be religious exercise of the person or entity that uses or intends to use the property for that purpose.

42 U.S.C. § 2000cc-5(7).  The diocese acknowledges that the parish center is an "ancillary" use under the bylaw.  Nonetheless, the diocese asserts here, as it had before the ZBA, that the parish center is "central" to the church's mission and, hence, part of its "religious exercise."  *Compare Needham Pastoral Counseling Ctr., Inc. v. Bd. of*

*Appeals of Needham*, 557 N.E.2d 43, 46-47 (Mass. App. Ct. 1990) (upholding denial of permit for pastoral counseling center which would resemble mental health counseling more than religious activity). Plaintiffs hardly disagree.

The court finds that the activities to be conducted in the parish center encompass "religious exercise." As indicated, to qualify as "religious exercise" under RLUIPA, the practice need not be "compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000 cc-5(7)(A). Moreover, religious exercise includes "[t]he use, building or conversion of real property for the purpose of religious exercise. " 42 U.S.C. § 2000cc-5(7)(B). Of course, every building owned by a religious organization does not fall within this definition. Buildings used by religious organizations for secular activities or to generate revenue to finance religious activities are not automatically protected. *See, e.g.*, *Westchester Day Sch. v. Village of Mamaroneck*, 386 F.3d 183, 189-90 (2nd Cir. 2004) (rejecting as too expansive trial court's determination that renovation of a religious school, which would include rooms for secular functions, was entirely "religious"). Here, however, the ZBA found that the parish center "is both central to and necessary to St. Ann's programs and church services" and "is a reasonable extension of St. Ann's Church's religious use of its property." (Def.'s Ex. 3(A) (ZBA Decision) ¶¶ 20(a) and 24.) Based on the record, this court, too, finds that the proposed parish center falls well within the definition of "religious exercise." It would house an office for religious education and would serve as a meeting place for the parish council. It would also be the locus of small gatherings related to church services, as well as other

functions presently being performed in the rectory.³

(ii) Substantial Burden

The next question raised by Plaintiffs' initial argument is whether the bylaw imposes a "substantial burden" on St. Ann's acknowledged religious exercise. RLUIPA, unfortunately, does not define "substantial burden." At best, its legislative history clarifies that a substantial burden on religious exercises "must be established 'by reference to Supreme Court jurisprudence' under the Free Exercise clause of the First Amendment." *Regulating Historic Religious Properties Under RLUIPA*, SL014 ALI-ABA at 724 (quoting 146 Cong. Rec. S. 7776 (July 27, 2000)). For its part, the Supreme Court had made clear in other contexts that the "substantial burden" hurdle is high and that the issue is intensely fact-specific. *See, e.g., Hobbie v. Unemployment Appeals Comm'n*, 480 U.S. 136, 141 (1987) (finding burden when government puts "substantial pressure on an adherent to modify his behavior and to violate his beliefs"); *Wisconsin v. Yoder*, 406 U.S. 205, 234-35 (1972) (compulsory school attendance law and criminal sanctions for noncompliance interfered with free exercise rights of Amish); *Sherbert v. Verner*, 374 U.S. 398, 404 (1963) (finding burden when individual is required "to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion . . . on the other hand"). *But see Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450-51 (1988) (no burden where government action interferes with, but does not coerce, individual's

---

³ Several of these facts were presented in the diocese's memorandum in support of its application for the building permit. Absent a transcript of the later ZBA hearings, the court can fairly infer that these same representations were made at those hearings.

beliefs) (citing *Bowen v. Roy*, 476 U.S. 693, 699-700 (1986)); *Braunfeld v. Brown*, 366 U.S. 599, 605 (1961) (no burden where regulation made religious observation more expensive).

Despite the definitional fluidity, Plaintiffs assert that the diocese's inability under the bylaw to construct an accessory use to a house of worship does not constitute a substantial burden under RLUIPA as a matter of *law*. The court disagrees. Although several circuit courts have used a variety of standards to determine a substantial burden, those standards, as might be expected, invariably are tied to the facts of the particular case, as is true here as well.

In *Midrash Sephardi*, for example, the Eleventh Circuit indicated that a "substantial burden" is one which "place[s] more than an inconvenience on religious exercise" and is "akin to significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly." *Id.*, 366 F.3d at 1227. Applying that standard, the Eleventh Circuit found that a zoning provision which excluded religious uses in a business district did not impose a substantial burden on the exercise of religion even though the provision made it harder for some members of two Jewish congregations to walk to the synagogue on the Sabbath. *Id. But see id.* at 1230-40 (holding that disparate treatment of synagogues violated RLUIPA's "equal terms" provision). In *San Jose Christian College*, the Ninth Circuit stated that the city was "prohibited from imposing and implementing a land use regulation in a manner that imposes a 'significantly great' restriction or onus on any 'exercise of religion,'" but upheld the denial of an application to rezone a site from hospital use to educational use because the city's regulations "d[id] not render religious exercise effectively

impracticable." *Id.*, 360 F.3d at 1034-35.  Similarly, in *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752 (7th Cir. 2003), the Seventh Circuit determined that "a land-use regulation that imposes a substantial burden on religious exercises is one that necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise–including the use of real property for the purpose thereof within the regulated jurisdiction generally–effectively impracticable."  *Id.* at 761.  The First Circuit has not weighed in on the issue.  In any event, this court finds it impossible to declare, Plaintiffs' arguments to the contrary, that the inability to construct a building which is an accessory use cannot be a substantial burden as a matter of law.

As a second line of argument, Plaintiffs assert that the diocese, as a matter of *fact*, did not adequately demonstrate that the bylaw imposed a "substantial burden" on St. Ann's religious practices.  To factually show a substantial burden, Plaintiffs assert, the diocese had to prove that the bylaw burdened the practice of religion by preventing St. Ann's adherents from engaging in conduct or having a religious experience that their faith mandates.  *See Bryant v. Gomez*, 46 F.3d 948, 949 (9th Cir. 1995) (construing RFRA).  Moreover, Plaintiffs argue, the burden must be more than an inconvenience, *i.e.*, it must interfere with a tenet or belief that is central to religious doctrine.  *See id.*

In pursuing this line of attack, Plaintiffs aim most of their argument at the advisory opinion given to the assistant building inspector, May, by Dubendorf, the special town counsel.  Dubendorf recognized, appropriately, that in accord with RLUIPA, the diocese had to establish that the bylaw imposed a substantial burden.  He then opined that the diocese met the test:

> Keeping in mind that RLUIPA commands us to construe the