> statute broadly in favor of religious exercise, it does appear that § 9.18 of the Bylaw prevents St. Ann's from "engaging in conduct . . . that is central to [its] religious doctrine," and that the application of § 9.18 is "more than an inconvenience" to St. Ann's.

(Def.'s Ex. 3(E) at 3.) This advice, Plaintiffs argue, was conclusory at best, based as it was on the uncontested assertions proffered at the time by the diocese in support of its permit application.

Plaintiffs' argument in this regard has some resonance. When issuing the building permit, May appears to have relied almost exclusively on Dubendorf's advisory opinion. Plaintiffs fail to fully appreciate, however, that it was the ZBA, not Dubendorf, that ultimately considered the issue and, after three hearings, concluded that St. Ann's had established that the bylaw imposed a "substantial burden" on its adherents' exercise of religion. And on the present record, the court agrees. As described, the parish center would serve as a meeting place for the parish counsel, would include an office for religious education, could facilitate gatherings related to church services and would, in the process, alleviate crowding in the rectory. The inability of St. Ann's to build the parish center would substantially burden all these religious activities. *See* also *Young Israel Org. of Cleveland v. Dworkin*, 133 N.E.2d 174, 176 (Oh. Ct. App. 1956) (noting centrality of meeting rooms, clubs rooms and classrooms).

To be sure, Plaintiffs, citing affidavit and deposition testimony, make much of the fact that St. Ann's has flourished for ninety years, has enabled its adherents to exercise their religion within its structural limitations and could make certain accommodations within its existing structures to meet its ongoing religious needs. *See Episcopal Student Found. v. City of Ann Arbor*, 341 F. Supp. 2d 691, 704 (E.D. Mich. 2004) (denial of

permit -- to demolish building that was inadequate to fulfill plaintiff's religious needs -- did not substantially burden free exercise rights because plaintiff's needs could be addressed by leasing new space or by expanding or renovating the building). Indeed, Plaintiffs argue, RLUIPA was not even intended to apply to the present situation which involves a well-established, mainline congregation. Rather, they assert, Congress was concerned with discrimination against "small and unfamiliar" denominations as well as zoning patterns which limited "new religious groups" from moving into a community, neither of which is the case here.

The court does not take so cramped a view of RLUIPA, and its legislative history is instructive in this regard. While Congress no doubt was concerned about "unfamiliar" religions, that concern was not exclusive:

> The right to assemble for worship is at the very core of the free exercise of religion. Churches and synagogues cannot function without physical space adequate to their needs and consistent with their theological requirements. The right to build, buy, or rent such a space is an indispensable adjunct of the core First Amendment right to assemble for religious purposes. The hearing record compiled massive evidence that this right is frequently violated. Churches, in general, and new small, or unfamiliar churches in particular, are frequently discriminated against in the fact of zoning codes and also in highly individualized and discretionary processes of land use regulation.

146 Cong. Rec. S. 7774-5 (July 27, 2000) (as quoted in *Cathedral Church of the Intercessor v. Inc. Vill. of Malverne*, 353 F. Supp. 2d 375, (E.D.N.Y. 2005)). As is clear, Congress was equally concerned with "churches and synagogues . . . in general." *Id.*

Moreover, as applied here, the bylaw would preclude *any* additional construction on property owned by a religious institution, yet another concern of RLUIPA. The

statute defines "land use regulation," in pertinent part, as "a zoning or landmarking law, or the application of such a law, *that limits or restricts a claimant's use or development of land (including a structure affixed to land)*, if the claimant has an ownership, leasehold, easement, servitude, or other property interest in the regulated land." 42 U.S.C. § 2000cc-5(5) (emphasis added). This provision applies as equally to the facts here as to an "unfamiliar" church seeking to build its first sanctuary. *See Board of Zoning Appeals of Elkhart County v. New Testament Bible Church, Inc.*, 411 N.E.2d 681, 685 (Ind. Ct. App. 1980) ("[I]f one is entitled to build a church, he may not be denied the opportunity to build accessories as well."). The statute certainly does not contemplate that a church's religious exercise can be frozen in place. Thus, what might have been adequate ninety years ago may not necessarily be adequate today. As time passes, the religious needs of an institution can grow so large that the impinging nature of zoning laws may become much more burdensome. Similarly, the construction of the parish center at another location, as Plaintiffs suggest, would not avoid the bylaw's substantial burden on religious exercise at St. Ann's present location. *See Saints Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin*, 396 F.3d 895, 901 (7th Cir. 2005) (holding that city had created a substantial burden by requiring church to "search[ ] around for other parcels of land" rather than rezoning property church already owned).

In the end, there is sufficient evidence in the court record to conclude, as had the ZBA, that the denial of a permit to build the parish center would substantially burden religious exercise at St. Ann's. In effect, the types of religious exercises that would take place in the parish center would be substantially compromised were section 9.18 of the

bylaw and its related provisions imposed on the diocese. Accordingly, and perhaps most importantly, the ZBA's decision, on the issue of substantial burden, was clearly not "based on a legally untenable ground," nor was it "unreasonable, whimsical, capricious or arbitrary."

      c. *Is the Bylaw the Least Restrictive Means of Furthering a Compelling Government Interest?*

Plaintiffs next argue that even if the bylaw substantially burdened religious exercise, it was the least restrictive means of furthering a compelling government interest. *See* 42 U.S.C. § 2000cc(a)(1) (land use regulation can place substantial burden on the exercise of religion only if it "(A) is in furtherance of a compelling governmental interest; and (B) is the least restrictive means of furthering that compelling governmental interest"). Assuming the burden of proof on this point, Plaintiffs contend that the setback, density and parking requirements of section 9.18 and its related provisions reflect compelling governmental interests and that, in any event, the diocese was not being treated worse than other places of assembly. For its part, the diocese asserts that there is no compelling state interest to justify the burdens imposed by the setback and density (as distinct from the parking) requirements, that the ZBA made claim to no such interest and that, in any event, there are other, less restrictive means of furthering the town's interests, means which the ZBA in fact employed. Again, the court finds that the diocese has the better argument, particularly when considering the deferential standard of review which this court must apply.

      (i)  Compelling Government Interest

As is true with the term "substantial burden," RLUIPA does not define "compelling

governmental interest." Its legislative history, however, "indicates the phrase was taken directly from [RFRA], and 'was and is intended to codify the traditional compelling interest test.'" *Elsinore Christian Ctr.*, 291 F. Supp. 2d at 1091 (quoting Statement of Rep. Charles T. Canady, RLUIPA sponsor, 146 Cong. Rec. E 1563 (2000)). One of RFRA's stated purposes was "to restore the compelling interest test as set forth in *Sherbert* . . . and . . . *Yoder*." 42 U.S.C. § 2000bb(b). In *Sherbert*, the Supreme Court considered South Carolina's denial of unemployment benefits to a Seventh Day Adventist who, in conformity with her religion's Sabbatarian beliefs, refused to work on Saturdays. *Id.*, 374 U.S. at 400. The Court concluded that the scheme effected a burden on the adherent's religious exercise and that any interest in avoiding abuse of or fraud on the unemployment system did not represent a "compelling state interest." *Id.* at 405-09. "[I]n this highly sensitive constitutional area," the Court noted, "only the gravest abuses, endangering paramount interest, give occasion for permissible limitation." *Id.* at 406 (citation and internal quotation marks omitted). Similarly, in *Yoder*, the Court held that Wisconsin's interest in an educated citizenry was not sufficient to warrant impinging upon Amish and Mennonite beliefs that militate against formal education after the eighth grade. *Id.*, 406 U.S. at 234-35. The Court observed that "only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion." *Id.* at 215. *See also Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, --- U.S. ---, 126 S.Ct. 1211, 1213-14 (2006) (discussing *Sherbert* and *Yoder*).

In the instant case, Plaintiffs are not particularly clear what "compelling government interest" they believe is served by the bylaw. The town, for its part, claims

25

none. At best, Plaintiffs assert that Dubendorf, in his opinion letter to May, failed to examine the other uses permitted at the site which would have -- in Dubendorf's words -- "arguably, equal or greater impacts on the protected interest," *i.e.*, adverse traffic and increased activities at the site. (Def.'s Ex. 3(E) at 3.) Had Dubendorf performed a more thorough analysis, Plaintiffs argue, he would concluded that the special permit, site plan and additional zoning requirements necessary for other uses, *e.g.*, museums and libraries, are far more restrictive than the favorable regulations set forth in section 9.18. Therefore, Plaintiffs assert, the contention that section 9.18 cannot further a compelling interest is simply wrong.

As is obvious, Plaintiffs again target Dubendorf's advisory opinion rather than the ZBA which considered and decided all the central issues. In essence, the ZBA determined that there was no compelling town interest in imposing either the 200-foot setback requirement or the four percent building lot coverage requirement for religious institutions. Plaintiffs have not convinced the court otherwise.

Like the ZBA, the court believes that the setback and coverage requirements reveal no particularly compelling interest. As the diocese points out, these restrictions, in combination, are more stringent than any others applied in the town's residential, commercial and industrial areas. Under section 8.4 of the bylaw, for example, maximum building coverage for all districts range from ten percent (in one residential district) to twenty percent (in the other residential and commercial districts) to thirty-five percent (in the industrial district). To be sure, the harsher four percent coverage for religious uses applies to educational institutions as well, but the court sees no reason why religious and educational institutions necessarily fall within the same class and, in

any event, the educational institution requirement is not before the court. Moreover, in contrast to a five percent coverage requirement for planned unit offices or research centers -- which applies in residential areas only and to a minimum lot size of fifteen acres (see bylaw § 9.14.1) -- the four percent coverage for religious institutions applies without reference to lot size. And while other zones may have similar set back requirements, none have the particular restrictive combinations applied by section 9.18 to religious institutions.

Finally, it should be noted that May and the ZBA did impose restrictions on the building permit to address yet other town interests, parking and congestion. Prior to RLUIPA, of course, such traffic concerns were not universally considered compelling. *See, e.g., Love Church v. City of Evanston*, 671 F. Supp. 515, 519 (N.D. Ill. 1987) ("While traffic concerns [generated by a church] are legitimate, we could hardly call them compelling."). Yet even assuming that such concerns are compelling under RLUIPA, as Plaintiffs maintain, the ZBA, in the court's opinion and as described below, furthered those interests in "the least restrictive means" as required by 42 U.S.C. § 2000cc(a)(1)(B).

(ii) <u>Least Restrictive Means</u>

As indicated, the only compelling governmental interests that Plaintiffs have articulated are, arguably, the town's parking and traffic congestion concerns. With regard to congestion, Plaintiffs assert that St. Ann's Avenue is often blocked with cars and pedestrians as parishioners arrive and leave. Certain plaintiffs also point to illegally parked cars, particularly during significant church events. As described, however, the ZBA approved a condition imposed by May that the parish center and church not

operate at the same time. In the court's opinion, this condition addressed Plaintiffs' concerns about congestion in an appropriate, non-restrictive manner.

As for parking concerns, both sections 9.18 and 10 of the bylaw require one parking space for every three seats for "places of assembly." St. Ann's sanctuary currently has 600 seats and only 44 parking spaces, but St. Ann's preexisted the parking requirements and, accordingly, was not in violation. Plaintiffs nonetheless assert that the 150 seat parish center, when added to the sanctuary's seating capacity, would violate the 1:3 parking requirements. Therefore, Plaintiffs argue, the diocese needs to seek a variance on this issue.

The court disagrees. First, as indicated, one condition of the permit is that the parish center and sanctuary not operate at the same time. Thus, it was well within the ZBA's power to apply the 1:3 parking ratio to the parish center alone, rather than in combination with the grandfathered sanctuary. Second, the ZBA further required as a condition of the building permit that St. Ann's add fifty *more* parking spaces on site, thereby independently fulfilling the 1:3 requirement for the parish center and, as a result, providing additional spaces when the sanctuary alone was in use. Accordingly, there was no section 9.18 or 10 violation -- or any obligation for the diocese to seek a variance -- and such allegations in Plaintiffs' complaint (see, *e.g.*, Counts I and II) fall of their own weight.

To be clear, the court is concerned that the precise location of the additional parking on the property could run afoul of the bylaw. As the court understands matters, the additional parking was added as a condition by the ZBA after the conclusion of the hearings without the abutters having had an opportunity to comment on its location or

28

design.  (See Pls.' Ex. F (Affidavit of James Biancolo) ¶ 7.)  The court, therefore, expects that the town will ensure that the location of the additional parking will conform to its bylaw.  The court also fully expects that the town will not turn a blind eye to on-street parking violations and will enforce all such regulations as well.[4]

At bottom, the ZBA was on solid footing when it concluded that the bylaw was not the least restrictive means of furthering a compelling government interest.  Moreover, the ZBA's decision certainly was not "based on a legally untenable ground" nor was it "unreasonable, whimsical, capricious or arbitrary."  Accordingly, the diocese's motion with respect to the bylaw counts will be allowed.

    5.  <u>Remaining Arguments With Respect to Counts V and VI</u>

Plaintiffs raise two additional issues in the context of Counts V and VI which, if decided in Plaintiffs' favor, could require further review by the ZBA.  For the reasons which follow, the court concludes that the diocese has the stronger argument on these issues as well.

    a.  *Remand to ZBA*

Plaintiffs first argue that if any part of the bylaw is unenforceable under RLUIPA, the diocese's building permit should be remanded to the ZBA in order to determine the

---

[4] One additional point with regard to Count Four and Plaintiffs' invocation of section 5.5 of the bylaw (which requires a special permit for "any extension, alteration or reconstruction of a non-conforming structure"): Plaintiffs' arguments to the contrary, the ZBA did not have to deal with section 5.5 since the so-called "non-conforming structure," *i.e.*, the sanctuary, was not being "exten[ded], alter[ed] or reconstruct[ed]." During the series of public hearings, the diocese eliminated a "Cloister" from plans which otherwise would have connected the parish hall to the preexisting structure.  (See Def.'s Ex. 3(A) ¶ 22.)  As a result, the request for a building permit concerned new construction only.

extent to which the remaining bylaw provisions should apply to the proposed parish center.  For example, Plaintiffs assert, it is possible that certain parts of the bylaw -- such as the parking regulations -- could be held valid under RLUIPA, while other parts might be found invalid.  At the very least, Plaintiffs imply that the issues could be resolved by having the diocese seek a special permit or variance.

Unfortunately for Plaintiffs' cause, the one example offered by them is insufficient as a matter of both fact and law and their remaining argument is too vague to be of much assistance.  First, the parking regulations invoked by Plaintiffs remain in effect.  The diocese's target was only so much of section 9.18 as concerned building coverage and setback.  The parking regulations themselves were not challenged.  Nor was section 10 of the bylaw which also governs off-street parking.

Second, requiring the diocese to apply for a special permit or variance, as Plaintiffs suggest, would be an empty exercise.  Indeed, in many ways, Plaintiffs' argument harkens back to the letter submitted by their counsel to the ZBA prior to the first hearing.  Plaintiffs' counsel asserted therein that the matter before the ZBA should proceed in two stages.  The ZBA, he argued, must first determine whether or not it was proper for May to have issued the building permit on the opinion of special town counsel.  "Should the ZBA determine that the building permit was issued in error and that a special permit and/or variance is required," Plaintiffs' counsel continued, "we believe the procedure would be for [St. Ann's] to make the requisite application and have the legal notices filed."  (Complaint, Ex. H.)  The second stage of the hearings, counsel added, would involve the ZBA's consideration of St. Ann's application for a special permit or variance.  (See *id.*)

30

As is obvious, Plaintiffs' counsel did not allow for the possibility that the ZBA would reject his analysis and, instead, treat the matter as an abutters' appeal of the building permit issued by May, thereby exempting St. Ann's from applying for a special permit or variance. As the diocese notes, the town had the option, albeit not an obligation, under RLUIPA to refuse to enforce so much of the offending bylaw as placed a substantial burden on St. Ann's religious practices. *See* 42 U.S.C. § 2000cc-3(e) ("A government *may* avoid the preemptive force of any provision of this chapter by changing the policy or practice that results in a substantial burden on religious exercise, by retaining the policy or practice and exempting the substantially burdened religious exercise, by providing exemptions from the policy or practice for applications that substantially burden religious exercise, or by any other means that eliminates the substantial burden.") (emphasis added). This is exactly what the town chose to do.

Granted, as Plaintiffs point out, the procedure utilized by the ZBA may have shifted the burden between the parties. As it stood, Plaintiffs, as abutters challenging the permit issued by May, had to obtain four of the five ZBA votes to have the permit revoked. Had St. Ann's instead been required to seek a permit from the ZBA, four of five votes would have been necessary in its favor. In any event, the vote was five to zero in favor of the building permit, and the court finds no evidence in the record to believe that shifting the burden would have made any difference.

More to the point, the standards for reviewing zoning decisions demonstrate the deficiency of Plaintiffs' argument. First, "the board's decision is the point of departure for the court's review." *Britton v. Zoning Bd. of Appeals of Gloucester*, 794 N.E.2d 1198, 1202 (Mass. App. Ct. 2003) (citation omitted). Second, "the court must find the

31

facts *de novo* and give no weight to those the board has found." *Id.* (citing, *inter alia*, Mass. Gen. L. ch. 40A, § 17; *Pendergast v. Bd. of Appeals of Barnstable*, 120 N.E.2d 916, 919 (Mass. 1954)). Finally as described, the court, to set aside the ZBA's decision, must find that the decision was "based on a legally untenable ground, or is unreasonable, whimsical, capricious or arbitrary." *MacGibbon*, 255 N.E.2d. at 350. That hurdle has not been surmounted here. *See also Hagopian v. Salafina*, 2005 WL 1324765, at *4 (Mass Land Ct June 6, 2005) (while there may be some differences between the review of a *grant* of a permit and its *denial*, "the theme of deference to the board's reasonable judgments is common to both") (citing *Garvey v. Bd. of Appeals of Amherst*, 400 N.E.2d 880 (Mass. App. Ct. 1980)).

      b. *Section 3 and RLUIPA Preemption*

Plaintiffs also point to section 3 of chapter 40A, a Massachusetts zoning statute which existed prior to RLUIPA and question whether that statute should be preempted by the federal law. This statute -- referred to by the parties as the "Dover Amendment" because it traces its roots to *Attorney Gen. v. Dover*, 100 N.E.2d 1 (Mass. 1951) -- provides in applicable part that "[n]o zoning ordinance or by-law shall . . . prohibit, regulate or restrict the use of land or structures for religious purposes . . . ; provided, however, that such land or structures may be subject to reasonable regulations concerning the bulk and height of structures and determining yard sizes, lot area, setbacks, open space, parking and building coverage requirements." Mass. Gen. L. ch. 40A, § 3. RLUIPA, in turn, provides that nothing therein "shall be construed to preempt State law . . . that is equally as protective of religious exercise as, or more protective of religious exercise than" RLUIPA itself. 42 U.S.C. § 2000cc-3(h).

Plaintiffs argue that RLUIPA does not preempt the Dover Amendment since it is arguably more protective of religious institutions than the federal statute. And unlike RLUIPA, Plaintiffs assert, the Dover Amendment has a solid body of case law to provide the ZBA with guidance in its application. Accordingly, Plaintiffs argue, this court should avoid unnecessarily preempting the existing statutory scheme and apply the Dover Amendment in the first instance. Had that been done by the ZBA, Plaintiffs conclude, it would have been evident that May exceeded his authority in granting a blanket exemption from the bylaw without an appropriate showing on St. Ann's part, particularly with respect to the parking provisions.

While creative, Plaintiffs' argument is not convincing. First, as the diocese argues, it is not at all clear that the Dover Amendment is more protective of religious institutions than RLUIPA. To be sure, the Dover Amendment provides that a zoning ordinance cannot prohibit the *use* of land or structures for religious purposes. However, it also provides that such land or structures may be subject to "reasonable regulations" concerning lot area, setbacks, parking and building coverage, among other items. In short, the Dover Amendment appears to provide nowhere near the kind of protection afforded by RLUIPA which, as indicated, prohibits land use regulations that impose a "substantial burden" on religious exercise.

Second, even were the court to accept Plaintiffs' comparison of the Dover Amendment to RLUIPA, there is hardly a difference that would matter here. In Plaintiffs' view, for example, the Dover Amendment -- which has been held constitutional by the First Circuit *see Boyajian v. Gatzunis*, 212 F.3d 1, 2-3 (1st Cir. 2000) -- provides a balancing test analogous to 42 U.S.C. § 2000cc-(a). And like RLUIPA, Plaintiffs assert,

33

the Dover Amendment can invalidate even a neutral zoning ordinance where it substantially burdens the use permitted an institution. *See Trustees of Tufts College v. City of Medford*, 616 N.E.2d 433, 437-38 (Mass. 1993) ("The whole of the Dover Amendment, as it presently stands, seeks to strike a balance between preventing local discrimination against [a religious] use and honoring legitimate municipal concerns that typically find expression in local zoning laws.") (citation omitted). Thus, even were Plaintiffs' analysis accurate, it is doubtful that the ZBA would have acted in any different a manner had it approached the issue via the Dover Amendment instead of RLUIPA. *See also id.* at 438 (observing that reasonableness under the Dover Amendment depends on the particular facts of each case).

Third, Plaintiffs' Dover Amendment argument is simply another attempt to overturn May's issuance of the building permit as if there had been no review of his decision by the ZBA. For all the reasons mentioned, however, the very issues which Plaintiffs wish to raise again before the ZBA, except perhaps for the exact location of on-site parking, have been addressed by the ZBA and, now, by this court.

As it turns out, the *Trustees of Tufts College* decision cited by Plaintiffs is particularly instructive with regard to their parking concerns, although perhaps not in ways they intend. Some history, however, is in order. Addressing a previous incarnation of the Dover Amendment, the Supreme Judicial Court ("SJC") in *Radcliffe College v. Cambridge*, 215 N.E.2d 892 (Mass. 1966), upheld a zoning requirement governing parking at an education institution (another subject of the Dover Amendment). *Id.* at 895-96. The court suggested, however, that future application of the requirement might be deemed unreasonable under the Dover Amendment if it were

34

to require the educational institution to provide more parking space "than could in reason be deemed necessary to take care of the cars brought to the [area] by the use made of it by the college." *Id.* at 896. As the SJC later noted in *Trustees of Tufts College*, this principle, as well as principles enunciated in *Sisters of Holy Cross v. Brookline*, 198 N.E.2d 624 (Mass. 1964), were later incorporated into the Dover Amendment. *Trustees of Tufts College*, 616 N.E.2d at 438 n.6. *See also The Bible Speaks v. Board of Appeals of Lenox*, 391 N.E.2d 279, 283 n.10 (Mass. App. Ct. 1979) (discussing history of Dover Amendment). The SJC concluded that the town's parking requirements were reasonable as applied to the Tufts campus. *Trustees of Tufts College*, 616 N.E.2d at 440. "Parking, as it affects physical conditions on and around an educational use," the court explained, "is a legitimate municipal concern and a proper subject of local zoning regulation." *Id.*

Here, in contrast, the diocese does not contest the town's application of its parking regulations to the site and has accepted the conditions imposed by the ZBA upon the building permit. Accordingly, as previously described, the diocese is not seeking to exempt itself under RLUIPA (or, assumedly, the Dover Amendment) from the town's parking requirements.

*Trustees of Tufts College* is noteworthy in at least one other respect, namely, its explanation that "a court may consider a municipality's concession, . . . in the course of litigation, that a particular requirement of its zoning law is unreasonable as applied to a proposed educational use." *Id.* at 439. The same, no doubt, can be said with regard to concessions regarding "religious" uses since the Dover Amendment applies both to educational and religious uses. The "concession" made by the municipality in *Trustees*

35

*of Tufts College* was to permit the college to treat the core area of its campus, despite the many buildings thereon, as a single lot for purposes of the parking ordinance. *See id.* at 339-40. This concession had a significant effect on the outcome of the case in that it eliminated more stringent parking requirements for individual campus buildings. *See id.*

While there is no such mid-litigation concession in the case at bar, it is significant, as described, that the ZBA ultimately agreed with the diocese's position and found, after hearings, that the bylaw, particularly the setback and lot coverage requirements, violated RLUIPA. The town does not seek to take a different position in this appeal. Of course, the ZBA's findings are not binding upon this court. Nonetheless, they have been taken into account as permitted by *Trustees of Tufts College* and in accordance with the standards of review. Morever, as described, the court has concluded independently that the setback and land coverage requirements violate RLUIPA, if not the Dover Amendment as well. Accordingly, as with the bylaw counts, the diocese's motion with respect to the remainder of Counts V and VI will be allowed.[5]

6. Historic Commission (Count VIII)

Finally, there appears to be no basis for Count Eight, which seeks to have the court refer the matter to the Historic Commission. Plaintiffs admit in their complaint that the proposed parish center will lie outside the historic district, even though the majority

---

[5] The court has reached this conclusion without even considering the diocese's alternative arguments that the bylaw violated RLUIPA's "equal terms," "nondiscriminatory" and "unreasonably limits" provisions. *See* 42 U.S.C. § 2000cc(b).

36

of the church buildings will continue to be within that district. Accordingly, the diocese's motion with respect to Count Eight will be allowed.

    7. Summary

For the reasons described, the court believes that the diocese's motion for summary judgment ought to be allowed with respect to each of the remaining counts. In addition, the diocese's arguments are equally applicable to the ZBA (the proper target of Plaintiffs' appeal) and May (who issued the permit in the first place), both of whom have remained silent.

B. PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

In reaching the conclusion that the diocese, the ZBA and May are entitled to summary judgment with respect to each of Plaintiffs' remaining claims, the court has reviewed the facts and inferences, pursuant to appropriate summary judgment praxis, in a light most favorable to Plaintiffs. It is, therefore, logically impossible to grant Plaintiffs summary judgment since, in doing so, the facts and inferences would have to be stated less favorably to them and more favorably to Defendants. As a result, Plaintiffs' motion for summary judgment will be denied.

## IV. CONCLUSION

For the reasons stated, the diocese's motion for summary judgment is ALLOWED and Plaintiff's motion for summary judgment is DENIED. Since the diocese's motion for summary judgment applies to the ZBA and May, judgment shall enter in their favor as well and the case may now be closed.

    IT IS SO ORDERED.

DATED: March 30, 2006

                                                  /s/ Kenneth P. Neiman  
                                              KENNETH P. NEIMAN  
                                              Chief Magistrate Judge